408 S.E.2d 41

**C.W. DEVELOPMENT, INC., Plaintiff Below, Appellee,**

v.

**STRUCTURES, INC. OF WEST VIRGINIA, Defendant Below, Appellant.**

**No. 19764.**

Supreme Court of Appeals of West Virginia.

Submitted May 15, 1991.

Decided July 11, 1991.

James W. St. Clair, St. Clair & Levine, Huntington, for appellee.

Edward M. Kowal, Jr., Frank H. Fitch, III, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, for appellant.

PER CURIAM:

Structures, Inc. of West Virginia and C.W. Development, Inc. entered into a contract whereby C.W. was to perform certain concrete and framing work on the Pine Woods Apartment project at Short Gap, Mineral County, West Virginia. While C.W. was performing the contract and without notice to C.W., Structures hired C.W.'s project superintendent, Harold Witt, to install utility lines. Thereafter, C.W. stopped work, fired Mr. Witt and sued Structures for both compensatory and punitive damages alleging an intentional interference with the employment relationship between C.W. and Mr. Witt. After the jury awarded C.W. $24,154.30 in compensatory damages and $75,000 in punitive damages, Structures appealed to this Court alleging that C.W. failed to show an intentional interference and that punitive damages should not have been awarded. Because the evidence in the record justifies the jury's determination that Structures intentionally interfered with the employment relationship between C.W. and its project superintendent, we affirm the decision of the Circuit Court of Cabell County.

On October 21, 1987, Structures and C.W. entered a contract whereby C.W. agreed to perform certain concrete work at the Pine Woods Apartment project in return for the payment of $66,484. The contract was signed for C.W. by Mr. Witt and C.W. began work in November 1987. In December 1987, Structures and C.W. agreed that C.W. would install certain framing for an additional payment of $10,-

489. The framing work was documented by change order number one, dated December 29, 1987, signed for C.W. by Carole Dawson, President of C.W. The record also contains a second change order, dated February 1, 1988, indicating that C.W. would provide a backhoe for moving brick and digging rock for $860 and would perform additional concrete work for $515, for a total additional payment of $1,375. The second change order, although signed by Structures, was never signed by C.W.

Before C.W. could complete all the concrete sidewalks, certain underground utility lines had to be completed. After Structures rejected all bids to install the utility lines (C.W. bid about $20,000), Structures purchased some material and attempted to contract for labor only. In December 1987, Structures asked Mr. Witt if he and the C.W. crew would install the utility lines by working after hours. Although Mr. Witt was a full-time salaried employee of C.W., he agreed to use C.W.'s crew to install the utility lines. Structures paid Mr. Witt $1,300 on December 11, 1987 and $3,000 on January 22, 1988. In order to install the utility lines, Mr. Witt used a backhoe that had been rented by C.W. and stone that had been paid for by C.W. The stone was valued at $855 and the second change order indicates that the rental cost of the backhoe to install the utility lines was $860.

Although the parties dispute how C.W. learned of Mr. Witt's installation of the utility lines, both agree that Structures never informed C.W. in advance of Mr. Witt's additional work.[1] In January 1988 after learning of Mr. Witt's additional work, C.W. fired Mr. Witt, and stopped work on the project. At the time C.W. stopped work, C.W. estimated that the original contract for concrete was 95% completed, and that the first change order for framing was 90% completed. Structures

paid C.W. $54,975.60 on the contract. After C.W. left the project, Structures hired Mr. Witt to complete the contract and paid him about $11,500.

Mr. Witt and the C.W. crew were supposed to install the utility lines after regular hours. Mr. Witt testified that the C.W. crew worked on the utility lines at least one weekend. However, C.W. maintained that given the amount of work necessary to install the utility lines, there was not enough daylight in December and January to complete the work outside the normal working hours.

C.W. sued Structures for compensatory damages based on the unpaid portion of the work C.W. completed and punitive damages based on an alleged tortious interference with an employment relationship.[2] The jury awarded C.W. $24,154.30 in compensatory damages and $75,000 in punitive damages. After the circuit court denied Structures' motion for a new trial or a *remittitur*, Structures appealed to this Court alleging the following assignments of error: (1) C.W. failed to prove that Structures intentionally interfered with an employment relationship without justification or excuse; (2) punitive damages were not justified; (3) the jury was given inconsistent instructions on the standard of proof; and (4) the circuit court failed to declare a mistrial because of improper and inflammatory remarks made during his closing argument of C.W.'s counsel.

## I

West Virginia's two leading cases on intentional interference with an employment relationship are *Torbett v. Wheeling Dollar Sav. & Trust Co.*, 173 W.Va. 210, 314 S.E.2d 166 (1983) and *Thacker Coal & Coke Co. v. Burke*, 59 W.Va. 253, 53 S.E. 161 (1906). *See Bryan v. Massachusetts Mut. Life Ins. Co.*, 178 W.Va. 773, 364

1. Structures alleges that Mr. Witt said he had C.W.'s permission to perform the additional work and that Structures inquired about Mr. Witt's progress on the utility lines in front of C.W. However, C.W. maintains that they had no knowledge of Mr. Witt's additional work but became concerned because of the lack of progress on the contract work only to discover

Mr. Witt's use of C.W.'s equipment, material and crew to install the utility lines.

2. In addition to the contract work performed and not paid for, C.W. sought recovery of the amount paid directly to Mr. Witt, $4,300 and the value of stone used to install the utility lines, $855.

S.E.2d 786 (1987) (holding no tortious interference existed because defendants had both a financial and business interest); W. Prosser and W. Keeton, *The Law of Torts*, § 129 at 995–96 (5th ed. 1984). Although *Torbett* concerned a covenant not to compete, we discussed the requirements of a *prima facie* case of tortious interference in an employment relationship and the factors that might show the interference was proper.

To establish prima facie proof of tortious interference, a plaintiff must show:

(1) existence of a contractual or business relationship or expectancy;

(2) an intentional act of interference by a party outside that relationship or expectancy;

(3) proof that the interference caused the harm sustained; and

(4) damages.

If a plaintiff makes a prima facie case, a defendant may prove justification or privilege, affirmative defenses. Defendants are not liable for interference that is negligent rather than intentional, or if they show defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper.

Syllabus Point 2, *Torbett supra.*

Our earlier case of *Thacker* concerned "damage for enticing servants from the plaintiff's service...." *Id.* 59 W.Va. at 254, 53 S.E. at 162. *Thacker*, in Syllabus Point 2, held at "[i]f one wantonly and maliciously, whether for his own benefit or not, induces a person to violate his contract with a third person to the injury of that third person, it is actionable."

On appeal, Structures maintains that there was no intentional interference. According to Structures, Mr. Witt said that it was fine with C.W. if he performed the additional work and Structures asked Mr. Witt about the progress of the additional work in the presence of Mrs. Dawson, C.W.'s president. Structures also maintains that Mr. Witt was approached in order to keep the job, including C.W.'s concrete work, from being delayed.

However, C.W. maintains that they were never informed of the use of their crew, their stone or even the backhoe they rented. C.W. claims that Mr. Witt's additional work was never discussed with them or in their presence. C.W. alleges that they became aware of the problem because the contract was exceeding the budgeted time. C.W. also presented evidence that the usual practice in construction was to seek an employer's permission before approaching an employee concerning additional or side work by an employee.[3]

In *Torbett*, we noted that the propriety of the interference was determined by examining the factual situation and we looked to the factors listed in the Restatement (Second) of Torts, § 767 [1977]. *Torbett, supra* 173 W.Va. at 215 n. 12, 314 S.E.2d at 172 n. 12. One of the factors listed in the Restatement (Second) of Torts, § 767 is "the nature of the actor's conduct." The established standard of a trade or profession provides a means of evaluating a particular "actor's conduct." *See, Duggin v. Adams*, 234 Va. 221, 360 S.E.2d 832, 837 (1987); *Sauls v. Penn Virginia Resources Corp.*, 121 F.R.D. 657, 661 (W.D.Va.1988); *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or. 201, 582 P.2d 1365, 1371 (1978) (liability might arise "by reason of ... perhaps an established standard of trade or profession"); *Trepel v. Pontiac Osteopathic Hosp.*, 135 Mich.App. 361, 354 N.W.2d 341 (1984) (unethical conduct is an improper method of interference); *Kinco, Inc. v. Schueck Steel, Inc.*, 283 Ark. 72, 671

---

**3.** The present case is distinguishable from the cases involving termination of an at-will employment contract because Mr. Witt remained an employee of C.W. while performing work for Structures. *See Artist v. Virginia Intern. Termi-* nals, Inc., 679 F.Supp. 587, 595 (E.D.Va.1988) *aff'd*, 857 F.2d 977 (4th Cir.1988) (requiring the use of "improper methods" when the employment contract is "terminable-at-will").

S.W.2d 178 (1984) (sharp dealing or overreaching can interfere with a business expectancy); *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686 (Tex.1989); *Light v. Transport Insurance Company,* 469 S.W.2d 433, 439 (Tex.Civ.App.1971) (competitive conduct "below the behavior of fair men similarly situated" is an improper method of interference). *See also Water Engineering Consultants, Inc. v. Allied Corp.,* 674 F.Supp. 1221, 1225 (S.D.W.Va.1987) (requiring "a purposeful wrongful act without justification or excuse"); *Precision Piping & Instruments, Inc. v. E.I. duPont De Nemours & Co.,* 707 F.Supp. 225, 231 (S.D.W.Va.1989).

In the present case, the jury determined that Structures' actions were an intentional act of interference. In Syllabus Point 2, *Perry v. Melton,* 171 W.Va. 397, 299 S.E.2d 8 (1982), we noted the standard for reviewing a jury verdict by stating:

> " 'In determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true.' Syllabus point 3, *Walker v. Monongahela Power Company,* 147 W.Va. 825, 131 S.E.2d 736 (1963)." Syllabus Point 4, *Long v. City of Weirton,* 158 W.Va. 741, 214 S.E.2d 832 (1975).

Structures acknowledged that it did not consult C.W. before asking Mr. Witt to perform the additional service, an act, which, according to C.W., failed to follow the established trade procedures. Neither did Structures ask to use C.W.'s stone or the backhoe C.W. rented. The second change order, dated after C.W. left the project, acknowledged that Structures should pay for the backhoe. We find that the matter was properly submitted to the jury and the jury could properly find that Structures had intentionally interfered with the employment relationship between C.W. and Mr. Witt.

## II

■ Next, Structures challenges the award of punitive damages, claiming that in an action for a breach of contract, punitive damages cannot be recovered absent proof of malice, wantonness or oppression. Although we agree that, generally, punitive damages are unavailable in a breach of contract action, Structures' argument fails to acknowledge that C.W.'s claim for punitive damages is based on the tort of intentional interference of an employment relationship.[4]

■ In Syllabus Point 4, *Harless v. First National Bank in Fairmont,* 169 W.Va. 673, 289 S.E.2d 692 (1982), we stated:

> "Punitive or exemplary damages are such as, in a proper case, a jury may allow against the defendant by way of punishment for wilfulness, wantonness, malice, or other like aggravation of his wrong to the plaintiff, over and above full compensation for all injuries directly or indirectly resulting from such wrong." Syllabus Point 1, *O'Brien v. Snodgrass,* 123 W.Va. 483, 16 S.E.2d 621 (1941).

Thus punitive damages are available to punish the defendant for "willfulness" or an intentional infliction of damages. In *Thacker supra,* 59 W.Va. at 256, 53 S.E. at 162, we held that when a servant is enticed to desert service by another, *"[m]alice* is inferred from the wrongful character of the act, and the declaration or complaint must disclose such facts as support the inference." *See Ilosky v. Michelin Tire Corp.,* 172 W.Va. 435, 307 S.E.2d 603, 619 (1983) (barring punitive damages because "Michelin had taken steps to warn the public about mixing radial and conventional tires").

■ The evidence shows that Structures did not have a contract to install the utility lines and the project's completion might be

---

4. *See Berry v. Nationwide Mut. Fire Ins. Co.,* 181 W.Va. 168, 381 S.E.2d 367 (1988); *Hayseeds, Inc. v. State Farm Fire & Cas.,* 177 W.Va. 323, 352 S.E.2d 73, 80 (1980); *Warden v. Bank of Mingo,* 176 W.Va. 60, 341 S.E.2d 679, 684 (1985); *Horn v. Bowen,* 136 W.Va. 465, 67 S.E.2d 737, 739 (1951) ("They [damages] cannot be punitive in action on contracts").

delayed. In order to avoid paying C.W.'s price (or any other bid) to install the utility lines, Structures hired Mr. Witt, a full-time employee of C.W., and C.W.'s crew to use C.W.'s equipment and C.W.'s stone to install the utility lines. Structures did not inform C.W. of its actions. We find that when an intentional interference with an employment relationship is alleged, the jury can properly consider the issue of punitive damages.

### III

■ Structure's final assignment of error concerns certain remarks made by C.W.'s counsel during closing argument.[5] In *Crum v. Ward*, 146 W.Va. 421, 434, 122 S.E.2d 18, 26 (1961), we noted that "wide latitude and freedom of counsel in arguments to a jury are and ought to be allowed...." In *Crum*, we then noted that this wide latitude was not without limits in that arguments should not be based on facts not in the record, contain appeals to the jury's passions and prejudice, or excite and inflame the minds of the jury against one of the litigants. *Id. See Groves v. Compton*, 167 W.Va. 873, 280 S.E.2d 708 (1981); *Jenrett v. Smith*, 173 W.Va. 325, 315 S.E.2d 583 (1983).

■ In the present case, we have reviewed the closing arguments of both counsel and find that closing argument of C.W.'s counsel does not require reversal given the measure of latitude and freedom counsel is allowed. Structures cites the following examples to show that the closing argument of C.W.'s counsel was improper: (1) the size of Structures' counsel's law firm, (2) the Pentagon–Rockwell defense consultants, and (3) the personal idiosyncrasies of Structures' counsel.[6] C.W. argues that these references were provoked by Structures. The record indicates that in his closing argument Structures' counsel said "I believe Structures acted reasonably" and discussed a dispute about

the production of documents. We also note that the referral to the Pentagon–Rockwell defense consultants was a response to Structures' examples of an automobile repair shop and a paint store. The record indicates that counsel for both parties are experienced attorneys who vigorously represented their clients throughout the trial.

We note that the trial judge who heard the case decided that C.W.'s closing argument did not improperly excite or inflame the jury. *See Board of Educ. of McDowell County v. Zando, Martin & Milstead, Inc.*, 182 W.Va. 597, 390 S.E.2d 796, 811 (1990) (recognizing that the trial court has discretion in determining when counsel's comments require a new trial). We find that the trial judge did not abuse his discretion in refusing to grant a mistrial.

For the reasons discuss above, we, therefore, affirm the final order of the Circuit Court of Cabell County.

Affirmed.

---

**5.** Structures also alleges that the jury was improperly instructed on the standard of proof. We note that C.W. alleged that the case concerned an intentional interference with an employment relationship, which requires proof by a preponderance of the evidence. *See Addair v. Huffman*, 156 W.Va. 592, 195 S.E.2d 739 (1973). However, Structures maintained that the case was based on fraud, which requires clear and

convincing evidence. *See* Syllabus Point 3, *Allegheny Development Corp., Inc. v. Barati*, 166 W.Va. 218, 273 S.E.2d 384 (1980). The jury was properly instructed on the standard of proof concerning each side's theory of the case.

**6.** Structures did not object to the remark about the personal idiosyncrasies.